

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SA/SDD/RMT                  *271 Cadman Plaza East*
F.#2012R01574               *Brooklyn, New York 11201*

January 8, 2016

<u>By E-mail and ECF</u>
James Turton
United States Probation Officer
United States Department of Probation
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   <u>United States v. Ahmed, et al. 12 CR 661 (S-2) (JG)</u>

Dear Mr. Turton:

The government submits this letter to advise the United States Department of Probation ("Probation"), as well as the Court and the defendants, of the government's position with respect to the various objections to the defendants' Presentence Investigation Report(s) ("PSR") which have been incorporated in the various submissions that were provided to the Court in advance of sentencing. Herein, the government consolidates the various objections raised by the defendants, advises Probation whether the government agrees or disagrees with the particular objection and, to the extent appropriate, and proposes alternative language to address the defendants' specified concerns or to otherwise correct any errors in the PSRs prepared for the defendants in this case. The government's proposed alternative language is set forth in italics.

I.   <u>Responses to Objections in the Defendants' Joint Sentencing Memorandum[1]</u>

   a.   Joint Objections: PSR p. 1, 2, ¶¶ 83 (Yusuf and Ahmed); ¶ 84(Hashi), ¶ 93 (Yusuf), ¶ 95 (Ahmed), ¶ 98 (Hashi), ¶ 96(Ahmed) – The defendants object to the descriptions contained on these various pages and paragraphs indicating that the defendants were "extradited" to the United States. (Joint Sent. Mem. pp. 1-2.)

---

[1] The defendants submitted a Joint Sentencing Memorandum on November 30, 2015, referred to herein as "Joint Sent. Mem.," which includes the bulk of the defendants' objections, many of which are relevant to all of the defendants in this case. (<u>See</u> ECF # 328.)

The government agrees that the defendants were not formally extradited to the United States and proposes that any reference to the defendants' extradition be removed from the PSRs and replaced with the following: "*lawfully transferred in custody*."

    b.  Joint Objections: The defendants object to the use of the term "Black or African American" to describe the race or ethnicity of the defendants. (Joint Sent. Mem. p. 2.)

The government agrees that the defendants' race or ethnicity should not be described as African American and that the defendants' race or ethnicity should be characterized as "*Black*" or "*Somali*."

    c.  Joint Objections:  The defendants object to the reference in the PSR to the time period of the offense as "between April 2008 and August 2012."  (See e.g. Ahmed PSR ¶ 1.) (Joint Sent. Mem. p. 2.)

The government agrees that any reference to the time period of the offense should be consistent with the indictment as follows: "*In or about and between April 2008 and August 2012, both dates being approximate and inclusive…*"

    d.  Joint Objections: The defendants jointly object to the "sections entitled 'Background' and 'Al-Shabaab's Recruitment and Use of Foreign Fighters' [(¶¶ 2-9)]" which they characterize as "misleading, irrelevant, and inflammatory." (Joint Sent. Mem. § D, p. 3-6.)   The defendants also make various claims regarding interactions between Ethiopia and Somalia later in their submission and Ahmed makes separate objections in his own sentencing memorandum.  (Joint Sent. Mem. p. 17-19; Ahmed Sent. Memo p. 5, and related exhibit.)

First, to the extent that the defendants complain, in paragraphs 2-9 of the PSR, that the PSR treats al-Shabaab "as a monolithic organization," and that "every person associated with al-Shabaab . . . shared the same clearly stated objectives and agenda," the government disagrees.  (Joint Sent. Mem. p. 3.)

As an initial matter, there is no specific indication in the PSR that al-Shabaab is "monolithic" and that every member "shared the same clearly stated objectives and agenda."  Moreover, the defendants in their submission substantially overstate the fragmentation and decentralization of al-Shabaab – in particular given the detailed testimony of the deposition witnesses to the contrary who identified unity of structure and organization in their description of conduct, aspirations, targets, tactics and relationships within al-Shabaab; both witnesses describe a military structure, with divisions, training camps, barracks, systems of indoctrination and taxation, a non-military command structure, a prolific media wing, an intelligence service, a mission – both within Somalia and without – among others things, which brought al-Shabaab during the time period of the charged conspiracy to near nation-state status.   Moreover, whatever divisions existed within al-Shabaab, no

evidence whatsoever exists that any part of that organization openly opposed suicide bombing, assassination, or similar such terrorist tactics which led to the group's designation by the United States as a Foreign Terrorist Organization.

      The unity of structure and organization in al-Shabaab is epitomized by, among other things, that designation by the United States as a foreign terrorist organization, in February 2008.[2]  Moreover, to the extent that the defendants offer these arguments as an alternative narrative regarding their role within al-Shabaab, and to suggest that their clients did not subscribe to al-Shabaab's publicly pronounced alignment with al-Qaeda, or its terrorist tactics, such as assassination, beheadings of rivals, suicide bombings of civilians, and a twisted and radically conservative interpretation of sharia law, such a narrative is directly contradicted by the information set forth in the PSR regarding the defendants specific conduct in this case.  Moreover, as the defendants later concede in their sentencing memorandum:

> [A]ccording to [Matthew] Bryden, al-Shabaab **distinguished itself** from other groups [in Somalia] in that members of al-Shabaab (1) **used assassination as a tactic**, and as early as 2007 and 2008, **was assassinating government figures,** elders, civil society figures, students, journalists and aid workers (See Bryden Tr. at A45-A46); (2) **used improvised explosive devices** or IEDS (See Bryden Tr.at A52-A53); (3) had been **orchestrating suicide bombings** since possibly as early as 2006, and definitely in 2007 and 2008 (See Bryden Tr. at A53-A57); (4) **saw its designation as an FTO in early 2008 as a badge of honor** (See Bryden Tr. at A44); and (5) sought to bring **their own form of Islamic government** to Muslims everywhere, and **believed that violence against governments that weren't sufficiently Islamic was justified.** (Joint Sent. Mem. p. 21 (citing Bryden Tr. at A48-A51.)(emphasis added))

      Second, to the extent that the defendants complain, in paragraphs 2 – 9 of the PSR, that the PSR unfairly suggests that "al-Shabaab is alone in committing conduct abhorred in the West such as targeting of journalists and foreign aid workings in Somalia" and that "al-Shabaab [is] alone in advocating adherence to Sharia law," (Joint Sent. Mem. § D, p. 4-5), the government disagrees.  As an initial matter, there is no specific indication in the PSR that al-Shabaab is a "al-Shabaab is alone in committing conduct abhorred in the West such as targeting of journalists and foreign aid workings in Somalia" and that "al-Shabaab [is] alone in advocating adherence to Sharia law."  Moreover, as al-Shabaab is the designated terrorist organization at issue in this case, any wrongdoing by another

---

[2] Likewise, the United Nations, Australia, Canada, New Zealand, the United Arab Emirates, the United Kingdom, Singapore, and Norway have all designated al-Shabaab as a terrorist organization.

organization or group has a diminished relevance for purposes of consideration in the PSR. Additionally, whatever wrongdoing might be ascribed to other organizations operating in Somalia during the time period of the charged conduct, al-Shabaab was alone in its public advocacy and thorough embrace of the types of terrorist tactics described herein.

With respect to "sharia law," traditionally speaking, Somalia's history is reflective of a very tolerant school of Shari'a, and its constitution embraces that notion, while simultaneously enshrining the concept of the freedom of Somalis to practice religion.   That constitution, and the Shari'a law it embraces, are hardly comparable to the twisted version of Shari'a embraced by al-Shabaab, which alone[3] in Somalia after 2006, embraced the concept of armed jihad against the government, and the right of *takfir*, or the ability, claimed by groups like al-Qaeda, al-Qaeda in the Arabian Peninsula, and the Islamic state, to denounce and kill (along with *kuffar* or non-believers) other muslims designated as *murtadiin* or apostates.

Third, to the extent that the defendants complain, in paragraphs 2 – 9 of the PSR, that the PSR is inflammatory and prejudicial in light of its reference to the 2013 attack on the Westgate Mall, the government agrees that the removal of this reference is appropriate.   To the extent that the defendants complain in paragraphs 2 – 9 that the PSR is inflammatory and prejudicial in light of the PSR's reference to the July 2010 suicide bombing attacks that were carried out in Kampala, Uganda, the government disagrees.   As a general matter, this attack, while egregious, is no more inflammatory than any of the other suicide bombing attacks described in the PSR, to which the defendants do not appear to object.  When compared to the 2008 suicide bombing attacks of the U.N. compound in Hargeisa and Bossasso, which Ahmed and Yusuf were intercepted discussing in detail before joining al-Shabaab, or the 2009 Hotel Shamo bombing, which was carried out by European foreign fighter and friend of Ahmed and Yusuf's, no obvious reason for the July 2010 Kampala attack's exclusion (which was initiated under the direction the emir of the foreign fighters, Sale Nabhan, and carried out by foreign fighters Ahmed and Yusuf had trained with or fought alongside) is apparent.   Indeed, if the Hargesa and Bossasso attacks in 2008 put Ahmed and Yusuf on notice of what type of terrorist activity al-Shabaab was engaged in (suicide bombing of civilians at the U.N.) before they departed Sweden, and the Hotel Shamo bombing in 2009 put them on notice of what type of terrorist activity their close friends in al-Shabaab were capable of (25 medical students murdered awaiting a rare

---

[3] According to Matthew Bryden, al-Shabaab's interpretation of Islamic Shari'a bears little resemblance to the form of Shari'a desired or practiced by most other Somalis, which is based on the more tolerant Shafi'i school of law.  According to Bryden, Al-Shabaab's understanding of Shari'a is virtually unique in Somalia in that it relies on *takfiri* teaching to allow the designation of other Muslims as 'apostates' and 'hypocrites' in order to legitimize their killing (the minor extremist group *Takfir wal Hijra* is the only other Somali sect currently known to adhere to the *takfiri* creed, but they are marginal and, to date, non-violent).

4

graduation in Mogadishu, along with at least two government ministers, including one former secretary of the Islamic Courts), the July 2010 bombing in Kampala served as gruesome reminder of al-Shabaab's external ambitions about which Yassin Yare, also known as "Sheihk Yahye," would preach to them at Beled Gudud.

Fourth, to the extent that the defendants seek to characterize the interactions between Somalia and Ethiopia, the government submits that Ethiopia's military interventions in Somalia over the past two decades must be understood in the different political and military contexts in which they took place.

- 1996-7: Ethiopia conducted two brief, limited operations across the Somali border into Gedo region, against bases of the jihadist group Al-Itihaad Al-Islaami (AIAI) in and around Luuq.  AIAI had been conducting cross-border operations against Ethiopia during the previous four years, including:

  - May 1995: a grenade attack on a busy market in Dire Dawa (Ethiopia) killed 15 people. Eight men alleged to be members of AIAI were later convicted of this and related terrorist offenses.
  - January 1996: six people were killed and 20 injured when a bomb exploded in the Ghion Hotel, Addis Ababa.  AIAI's spokesman in Mogadishu, Abdulqadir Mohamud Dhaqane, claimed responsibility on behalf of the organization.
  - February 1996: a bomb exploded in the Ras Hotel, Dire Dawa, killing one person and seriously injuring three others.  The AIAI spokesman in Mogadishu claimed responsibility.
  - February 1996: General Hayelom Araya, head of Operations in the Ethiopian Ministry of Defense, was assassinated.  AIAI claimed responsibility, but Ethiopia alleged that Eritrean agents were behind the attack.
  - March 1996: Hermann F.M. Hardin, a Dutch national, was murdered in Taiwan market, Dire Dawa.  Two alleged members of AIAI were subsequently convicted.
  - July 1996: the Ethiopian Minister of Transport and Communications, Abdulmejid Hussein (an ethnic Somali), was attacked by two gunmen while arriving at his office in Addis Ababa (he survived the attempt despite being shot 9 times).  An AIAI spokesman in Mogadishu claimed responsibility for the attack.
  - August 1996: a bomb exploded at the Wabe Shebelle Hotel in Addis killing two and injuring eleven.  AIAI did not take responsibility, but Ethiopia claimed that the organization was behind the attack.

Ethiopia's raids succeeded in destroying AIAI"s last remaining stronghold in Somalia and effectively dismantled what remained of the organization.  Significantly too, most Somalis were, at the time, hostile to AIAI and indifferent to Ethiopia's operations against the group.

- 2006-2009: Ethiopia intervened against the Islamic Courts Union in support of the Transitional Federal Government ("TFG") of President Abdillahi Yusuf Ahmed. This was unpopular among Somalis for several reasons.  Historical suspicion of Ethiopia was certainly one part of the equation, and this inflamed Somali nationalist sentiment. But at least as important, and arguably more so, was that Ethiopia was intervening in support of a deeply unpopular administration, headed by a figure whom most Somalis perceived as a clan warlord.  As Matt Bryden has written and testified about in court, this produced a widespread and complex insurgency, uniting nationalists, Islamists and clan chauvinists (i.e. mainly members of the Hawiye clan) against the TFG and its Ethiopian ally.  Although Ethiopian intervention took place at the request of the TFG and had the backing of the US government, it was not authorized by the UN Security Council and was perceived as illegitimate by a majority of Somalis.

- 2009 - 2012: Following the election of Sheikh Sharif Sheikh Ahmed, an Islamist and a member of the Hawiye clan, as President of the TFG, Ethiopia withdrew its forces from Somalia.  This removed the most widespread sources of grievance against the TFG, and armed opposition ceased with the exception of two groups: Al-Shabaab, and Hisb'ul Islam (which was headed by al-Shabaab ideologue Hassan Dahir Aweys and subsequently absorbed by al-Shabaab). Ethiopia was generally supportive of the new TFG (which ultimately transitioned into the current Somali Federal Government (SFG)) and the re-deployment of Ethiopian forces to parts of Southwest Somalia in 2011-2012, though illegal from a UN perspective, did not provoke the widespread anger and condemnation among Somalis that its previous intervention had done.

- 2013-2014: In 2013, the UN Security Council implicitly endorsed Ethiopia's military presence by establishing the designation 'AMISOM Strategic Partners,' which also encompassed Kenya.  Although the presence of Ethiopian and Kenyan troops has been controversial, and relations with the SFG have blown hot and cold, the situation was in no way comparable to the 2007-2009 period.

   e. Joint Objections:  The defendants indicate that they "are . . . in no position to either affirm or dispute the accuracy of the paragraphs," but they object generally in ¶¶ 2-9 to the use of various adverbs and adjectives in those paragraphs such as "regularly," "frequently," "numerous," "strong," "aggressively," "distinct,"  "significant," and "heavily."  (Joint Sent. Mem. p. 6.)

   The government disagrees with the defendants' generalized objection as to the use in the PSR of particular adverbs and adjectives in ¶¶ 2-9, in particular given that the defendants have indicated they "are . . . in no position to either affirm or dispute the accuracy of the paragraphs."  Regardless, to the extent that the defendants proffer specific bases for each of the objections, the government is willing to consider and revise its current position – that the language used by probation appropriately characterizes the defendants' conduct.

     f.  Joint Objections:  Indicating again that they "are . . . in no position to either affirm or dispute the accuracy of the paragraphs," the defendants also "object to the mention of beheadings" in this section; specifically, arguing that such references to beheadings are "irrelevant and inflammatory" – given that there is no evidence that the defendants directly participated in any beheadings on the battlefield – they object to the language in ¶ 3 of the PSR in which the PSR articulates the fact that "Al-Shabaab frequently beheaded TFG and AMISOM fighters, to instill fear in their adversaries."  (Joint Sent. Mem. p. 6.)

     While the government agrees with the proposition that "*there is no evidence that the defendants directly participated in any beheadings on the battlefield*," and believes that a sentence reflecting that fact would be appropriately added to the PSR to address the defendants' concerns, the government disagrees with the defendants' generalized objection to the inclusion in the PSR of information relevant to the general terrorist tactics – including beheadings, suicide bombings of civilians and other martyrdom operations, assassinations of Somali government leaders and the like – that unquestionably were utilized by al-Shabaab while the defendants were members of the organization.

     As an initial matter, there appears to be no dispute that al-Shabaab regularly carried out beheadings of TFG and AMISOM fighters, before, after and during the time period the defendants conspired to provide material support to al-Shabaab.  Specifically, al-Shabaab utilized this practice, for the reason set forth in the PSR "to instill fear in their adversaries" and for a second reason, *"in order to discourage desertion in its own ranks."*

     As early as the fall 2008, widely disseminated public reporting about al-Shabaab revealed that members of the organization had "sliced the head off" a twenty-five year old aid worker employed by the World Food Program, as horrified onlookers watched from a village located near Baidoa.  According to a news reports, militants from al-Shabaab had gathered villagers, who were anticipating the slaughter or a sheep, goat or camel, according to local custom, when five masked men emerged carrying guns, wielding Somali swords and dragging the handcuffed victim.  Having announced that the victim was an infidel and a spy, the al-Shabaab members chanted "Allah Akubar" as the head was severed from the victim's torso.

     Moreover, a deposition witness specifically testified about the actions of a U.S. foreign fighter, Abdi Salam Hussein Ali, also known as "Uhud," or "Uhudin," who trained with the defendants in Beled Gudud, fought on the battlefield with the defendants at Karan in 2009, and was "close friends" with defendants while they were in Somalia. (Tr. 138-139, 194.)  During the Karan battles, Abdi Salam Hussein Ali, also known as "Uhud," or "Uhudin," carried out a beheading of a TFG soldier.  Specifically, the deposition witness testified that:

        when [he observed] a person was being beheaded [on the battlefield at Karan], [Uhudin] was the one that cut the head first, to the point where they are fighting to be the first to cut off

the head.  And he cut and when he got the middle and the
person was screaming, when he got in the middle the others kept
finishing up to the point they cut off completely the head and
put it on his chest. (Tr. 139-141.)

The witness continued, indicating that he:

witnessed with [his] own eyes [] that that man [, the victim] was
a TFG soldier, to the point where when we were attacking they
started running, but he forgot to run and stayed behind a
building. And they chose to take him to Karan police station in
court, and some of them said, "No, we've just caught him with a
gun on the battlefield and he's a soldier."  So, people who voted,
those who were for him being taken to the police station were
fewer than those who were suggesting that he be killed right on
the spot, to the point where Uhudeen immediately took out his
knife. And they tied him up with the clothes they were wearing,
tied his hands and his legs.  And they started beheading him as
he was screaming, and blood was streaming. And others asked
him to stop so they can cut as well, until they completely
beheaded him and put his head on the chest and continued the
battle.  (Id.)

To this day, al-Shabaab continues to publicly embrace this military tactic.  As
recently as 2014, al-Shabaab produced a video, entitled "Uprooting them from Behind,"
which depicts a beheading of an enemy fighter in a manner remarkably similar to the
beheading described by the deposition witness.

With the inclusion of the additional language set forth above in italics, the
government submits that no additional modification to the PSR is necessary related to this
issue.

g.  Joint Objections:  Similarly, the defendants object to the following language in
¶¶ 4 - 6 of the PSR: "After an al-Shabaab member was killed by what al-
Shabaab believed to be a U.S. missile strike in May 2008, al-Shabaab leaders
declared that muhajareen [foreign fighters] would 'hunt the U.S. government'"
and "that 'foreign fighters,' with their foreign passports, were given combat
training in Somalia and then sent elsewhere in support of external terrorist
plots against Western countries and their allies in the region."  More
specifically, the defendants argue that such language is "prejudicial and
inflammatory," suggesting that "there is no evidence that any of these
defendants had any such intention or plan" and they argue that the PSR
mistakenly refers to "muhajareen [foreign fighters]" and not "muhajideen," or
fighters generally.  (Joint Sent. Mem. pp. 6-7, and Fn 6.)

As an initial matter, the government agrees that the PSR mistakenly refers to "muhajareen," in connection with al-Shabaab's May 2008 declaration regarding the U.S. government, and believes that the use of the term "*muhajideen*" or "*al-Shabaab fighters*" is appropriate here.  Other than this apparent typographical error, there appears to be no dispute as to the veracity of the statement ascribed to al-Shabaab, which was produced by al-Shabaab's media arm after the purported U.S. missile strike in May 2008.

With respect to the defendants' objection to the statement about "foreign fighters," and their role in al-Shabaab, the government has no objection to a slight modification of the quoted sentence above which should resolve the defendants' objection to the inclusion of such language in the PSR.  Specifically, the government proposes that the PSR language regarding the role of foreign fighters in al-Shabaab in this section be modified as follows: "*that 'foreign fighters,' with their foreign passports, were given combat training in Somalia and certain of those foreign fighters were then sent elsewhere in support of external terrorist plots against Western countries and their allies in the region. While the defendants were al-Shabaab foreign fighters, and were also directly associated with foreign fighters who were involved in suicide bombings in Somalia or otherwise sent abroad as external operatives, there is no specific evidence that the defendants themselves were sent in support of external terrorist plots against Western countries and their allies in the region*."

> h.  Joint Objections: Defendants Ahmed and Yusuf also object, generally, to information contained in ¶¶ 11-19 "ostensibly derived from the testimony of [two co-conspirator witnesses], who testified at Rule 15 depositions in February of this year." The defendants specifically argue that "assertions in the PSR based on this testimony [should be removed] as misleading and/or unreliable."  (Joint Sent. Mem. p. 7.)

The government disagrees with this generalized objection to the consideration of such testimony, in light of the Court's prior findings as to the credibility of the two witnesses in question.  (See ECF # 292, p. 4.)  On April 28, 2015, the Court issued an opinion addressing the defendants' motion to suppress the deposition testimony of the two witnesses referred to above.  Specifically, after having reviewed the testimony in question and having participated in the overseas depositions from New York, then-presiding District Judge Sandra Townes ruled as follows:

> Based on a review of the deposition testimony, the Court finds that the deponents' repeated statements that they were testifying voluntarily was credible, convincing, consistent and uncontroverted.  This testimony withstood the thorough cross examination of three defense counsel – no germane inconsistencies or flaws were revealed.  The witnesses convincingly explained what motivated them to cooperate with the United States and testify against defendants.  Specifically, one witness, who was no longer in custody when he testified, explained that he decided to tell the truth and cooperate with the

United States because (1) after reflecting on his crimes he came to regret his participation in al-Shabaab attacks, and (2) after he was treated with respect by United States agents, he realized that he had been misled by al-Shabaab into fearing and hating the United States.  The other witness testified that he agreed to cooperate with the United States at the urging of his mother.  Having observed the demeanor of both deponents when they explained their decision to testify, the Court concludes that the deponents testified voluntarily and were in no manner coerced to give evidence against the defendant by the maltreatment they suffered years earlier when they were first arrested.  Accordingly, suppression on these grounds is denied. (ECF # 292, p. 4)(emphasis added).

i.   Joint Objections:  Defendants Ahmed and Yusuf also specifically object to the inclusion in the PSR of the following language in ¶ 11: "…Ahmed and Yusuf were part of a growing group of young men in Sweden, who were seeking to leave the country to join various terrorists groups.  Many of these young men lived in Rinkeby, an impoverished and largely immigrant community located in the Northern part of the country."  Specifically, the defendants "dispute that either was part of any such group." (Joint Sent. Mem. p. 7.)

As an initial matter, in an effort to address the defendants' concern regarding the use of the term "group," the government requests that Probation replace the word "group" with the term "*network*" or "*number*."  Additionally, the description of Rinkeby as being "located in the Northern part of the country" is inaccurate and ¶ 11 should be revised to reflect the fact that Rinkeby is "*a suburb of Stockholm*."  Finally, the government believes that ¶ 11 should be revised to include the fact that many of the young men referred to in this paragraph also lived in "*Gothenburg, the second largest city in Sweden*."

j.   Joint Objections:  Defendants Ahmed and Yusuf also specifically object to the inclusion in the PSR of the following language in ¶ 12 of the PSR: "Ahmed and Yusuf sought to contact high-ranking members of al-Shabaab, including Swedish national Yassin Yare . . . and . . . Osman Yassin Ahmed . . who had been fighting for years with al-Shabaab." The defendants argue that there is no evidence that Osman Yassin Ahmed was a member of al-Shabaab, high-ranking or otherwise, or that he had been fighting for years with al-Shabaab.  They also argue that there is no evidence that Yassin Yare was a high ranking member of al-Shabaab.  (Joint Sent. Mem. p. 8.)

The government disagrees with the defendant's objections.  In particular, direct testimony about Yassin Yare, also known as "Sheikh Yahye," and his role as a leader in al-Shabaab was provided through the testimony of one of the Rule 15 depositions witnesses.  Specifically, the witness testified that (1) Yare "was in charge of preaching religiously to the fighters" and that Yare "was the one in charge" of religious lectures at the

Buled Gadud training camp (one of several camps created by the al-Shabaab foreign fighter emir, Saleh Nabhan, also a member of al-Qaeda with close ties to Osama Bin Laden), that defendants Ahmed and Yusuf and other foreign fighters attended in late 2008 and early 2009, (Tr. p. 39, 99, 117), (2) Yare "was from Sweden," (id.), (3) while in the training camp, <u>Yusuf served</u> as Yare's interpreter for al-Shabaab foreign fighters "who didn't understand English," (Tr. 114-15), (4) during his lectures at the camp, Yare would begin by "reminding [the muhajareen] why [they] were [in an al-Shabaab training camp] in terms of fighting jihad" and he would preach that once "they w[o]n the battle" in Somalia, the Muhajareen were to "finish the battle that was going to be started by Islam in the entire world," (Tr. 116-17), (5) Yare "would preach about" carrying out attacks outside of Somalia, (Tr. 119), that jihad "had to be spread around the world in other countries," (Tr. 120), that "once you die during the war or planning, you have to get shahada and afterwards, you go to Jannah," (Tr. 116-17), (6) during the Karan district battles, Yare was "<u>in charge of dawa</u>, which was a way of spreading information and advertising al-Shabaab," (Tr. 142-43), and (7) Yare "was <u>among [] leaders</u> who were under" the-then overall military commander for al-Shabaab in the Karan District battles, (Tr. 146), (emphasis added).

Additionally, as set forth in ¶ 14 of the PSR, and further corroborating the relationship between the defendants and Yare articulated by the deposition witness, "Yare . . . also was in telephonic contact with fellow Swedish co-conspirator Bille Ilyas Mohamed and seeking to recruit him to join Ahmed and Yusuf in Somalia in the al-Shabaab training camp. During a recorded conversation on February 2, 2009, Yare and Mohamed discussed the fact that Yusuf had already arrived in Somalia and, about halfway through their conversation, Yusuf joined the call and requested Mohamed to bring him a Swedish Koran, among other items, when he traveled to Somalia."

Swedish law enforcement records reflect the fact that Osman Yasin Ahmed, also known as "Atosh," and "Abdurahman," ("Osman") is the older brother of Ahmed. Given this, and given the close familial relationship, the government presumes that Ahmed, at least, will not dispute the basic premise that Osman had traveled from Sweden to Somalia on numerous occasions, before he and Yusuf departed in December of 2008, and that in some capacity Osman had fought with a jihadist group against the Somali government at some point before Yusuf and Ahmed arrived in Somalia. Moreover, in 2008, prior to their departure to Somalia, defendants Ahmed and Yusuf were intercepted by Swedish authorities discussing various topics, including their plan to join al-Shabaab and the need to contact Osman prior to their travel:

- On or about October 4, 2008, Ahmed and Yusuf spoke about finding a "job," and, based on the context of the discussion, that "job" apparently related to Somalia. Ahmed advised Yusuf that finding that "job" would not be a problem because they now had the "telephone number of the top bosses" in al-Shabaab.

- On or about October 30, 2008, Yusuf told Ahmed that he had made a decision, and that he had become surer and surer of that decision the more he prayed.

When Ahmed asked what the decision was, Yusuf said that "life on earth is short but life in paradise is eternal," and that was the reason for his decision. Ahmed told Yusuf that Yusuf would not regret his decision as long as he did everything according to Islam. Yusuf also told Ahmed that he wanted to visit Mecca before November, or otherwise it would be too late.

- On or about November 2, 2008, Yusuf said he "<u>wants [Ahmed] to talk to</u>" his older brother and that "[i]t is important to get hold of him."

- On or about November 4, 2008, Yusuf said he wanted Ahmed to call "Ilyas," presumably referring to co-conspirator Bille Ilyas Mohamed. Ahmed responded that he had already contacted Ilyas, and Ilyas had not heard anything.

- On or about November 5, 2008, Yusuf and Ahmed discussed how inspired and excited they were about photographs of al-Shabaab's implementation of aspects of *sharia* law (flogging) in Somalia. Yusuf "<u>once again asks [Ahmed] to contact his brother Osman</u>."

- On or about November 7, 2008, Yusuf and Ahmed discussed a speech by an al-Shabaab leader who stated that all Muslims had a duty to fight jihad in Somalia.

- In or about November, 2008, Yusuf told Ahmed that he was starting to have his doubts about al-Shabaab and wanted to talk to a sheikh about those doubts, which arose in connection with his understanding that al-Shabaab had carried out suicide bombing attacks in Hargeisa and Bosaso on civilians, discussed above. Ahmed responded that these casualties must have been a mistake, noting that everyone makes mistakes, even "our leaders." During their discussion, Ahmed suggested that al-Shabaab's suicide bombing of innocent persons was forgivable, just as another 'sin' (masturbation) committed by Yusuf was also forgivable.[4]

The context of the communications, including the indication that they had obtained the "telephone number of the top bosses" in al-Shabaab, and their repeated discussion of the importance of communicating with Osman <u>prior</u> to their travel to Somalia to join al-Shabaab, also reflects the significance that Osman had to them in connection with their travel to Somalia to join al-Shabaab. Finally, a second co-conspirator witness has specifically identified Osman as a foreign fighter who had previously fought with al-Shabaab in Somalia.

      k.   Joint Objections:  Defendants Ahmed and Yusuf generally object to ¶ 13 of the PSR which summarizes telephone calls between Ahmed and Yusuf that took place in Sweden in 2008, prior to Ahmed and Yusuf's departure to Somalia to

---

[4] The reports and transcripts relevant to 2008 intercepts are attached hereto as Exhibit A.

join al-Shabaab. Specifically, Ahmed and Yusuf object to the inclusion of information from these summaries "since neither the original audio nor word-for-word transcripts of these calls exist, and since counsel has no information as to who prepared the summaries and under what conditions and pursuant to what instructions they were prepared." (Joint Sent. Mem. p. 8.)

The government disagrees with the defendant's objections to the inclusion of the information set forth in ¶ 13 of the PSR. As an initial matter, as set forth above, the reports and transcripts relevant to the inclusion of the 2008 intercepts in the PSR are attached hereto as Exhibit A. Additionally, the government advises that it is aware of no legal impediment to the consideration in the PSR of the information set forth in the attached reports, notwithstanding that a number (but not all) of the original 2008 audio intercepts are no longer available. In response to the defendants' request for "information as to who prepared the summaries and under what conditions and pursuant to what instructions they were prepared," (Joint Sent. Mem. p. 8.), the government, hereby, advises that, in addition to the original audio and transcripts that are available for certain of the 2008 intercepts, (1) a Swedish government representative familiar with both defendants listened to the audio or reviewed the text messages sent and received by Ahmed and Yusuf in 2008, at the time those communications were intercepted and (2) summarized the content of those communications in a Swedish-language report that was generated in connection with the Swedish government's investigation into Ahmed and Yusuf at that time. Subsequently, a second report regarding an interview of that representative (during which U.S. authorities were present) was prepared by another Swedish government representative in February 2013, in connection with a U.S. request for assistance in the investigation in this case.

    l.   Joint Objections: Defendants Ahmed and Yusuf also object to ¶ 14 of the PSR, requesting that the language which indicates that the defendants arrived "in Somalia in late 2008 . . ." be changed to "December 2008." (Joint Sent. Mem. p. 8.)

The government agrees that the language of ¶ 14 of the PSR should be amended to reflect the following: "*Upon their arrival in Somalia in December 2008 . . .*"

    m.   Joint Objections: Defendants Ahmed and Yusuf also object to ¶ 14 of the PSR, disagreeing with the characterization of the religious instructions provided to the defendants by Yassin Yare as "lessons taught regarding al-Qaeda doctrine." The defendants complain that the "characterization of Yare's teachings as Al Qaeda doctrine (which suggests that Yare gave instruction on spreading jihad around the world and fighting beyond Somalia)" is supported only under a "strained interpretation of [the witness's]" testimony. (Joint Sent. Mem. p. 8.)

The government disagrees with the defendants objections. As set forth above, to the contrary, the deposition witness testified that (1) during his lectures at the camp, Yassin Yare would begin by "reminding [the muhajareen] why [they] were [in an al-Shabaab

13

training camp] in terms of fighting jihad" and he would preach that once "they w[o]n the battle" in Somalia, the Muhajareen were to "finish the battle that was going to be started by Islam in the entire world," (Tr. 116-17), (2) Yare "would preach about [carrying out attacks outside of Somalia," (Tr. 119), that jihad "had to be spread around the world in other countries," (Tr. 120), and that "once you die during the war or planning, you have to get shahada and afterwards, you go to Jannah," (Tr. 116-17).

Relatedly, the same deposition witness testified, regarding the relationship between al-Shabaab and al-Qaeda "that among people that created, started the – started it and established it and who actually led it, were trained and came from Al Qaeda" and that it was significant to al-Shabaab that they had "received an [audio message] from Usama Bin Laden in 2009 [during the Karan District battles] giving [al-Shabaab a] speech on the encouragement to fight – not to stop fighting the Shari[ff] government and TFG." (Tr. 56). That speech, known as "Champions of Somalia," was a public pronouncement of al-Qaeda and Osama Bin Laden's support of al-Shabaab and al-Qaeda's denouncement of Sheikh Shariff and the TFG, which the deposition witness testified was "broadcast publicly" to al-Shabaab fighters in Mogadishu during the time period of the Karan District battles, in which both Ahmed and Yusuf fought. (Tr. 56, 64-67.)

Similarly, the same witness testified about the allegiance to al-Qaeda held by al-Shabaab's leaders, including Saleh Nabhan, then the al-Shabaab emir of the foreign fighters. The witness also provided specific information about (1) Nabhan's historical role in al-Qaeda, (2) his role in the al-Qaeda led attack on the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, in 1998, and (3) his leadership role in the planning of an attack on the U.S. Embassy in Kampala, Uganda, that was later modified by al-Shabaab and ultimately resulted in the July 2010 suicide bombing attacks in that country.  (See Tr. 58-59.)[5]

Al-Shabaab's public pronouncements, before, during and after the time period of the charged conspiracy corroborate that testimony in significant part.  A summary of key public declarations – prior to the Fall of 2009 – which are relevant to al-Shabaab's relationship with al-Qaeda and its global jihadist ideology are set forth in an article written by Daveed Gartenstein-Ross, entitled "The Strategic Challeng of Somalia's al-Shabaab – Dimensions of Jihad," which was published for Fall 2009 journal The Middle East Quarterly.[6]

_____

[5] After Nabhan died in 2009, when he was reportedly killed as a result of a U.S. military action, the al-Shabaab leader known as Ikrima took over the planning for the operation of the Kampala mission and modified Nabhan's plan to use suicide bombers to target locations in Uganda that were easier to infiltrate than the U.S. Embassy.  Ultimately, this resulted in the July 11, 2010 attacks in Kampala at the Kyadondo Rugby Club and at the Ethiopian Village restaurant.

[6] A copy of the article is attacked hereto as Exhibit B.

14

Moreover, and relevant directly to the defendants argument that they did not subscribe to "al-Qaeda doctrine," and the al-Shabaab directive to implement jihad outside of the borders of Somalia, is the recorded declaration by the defendant Mohamed Yusuf, produced in an al-Shabaab foreign fighter propaganda film designed to recruit other young Muslim men to take up the jihadist cause in Somalia and elsewhere around the world. Therein, Yusuf specifically advocates and encourages other would-be jihadists outside of Somalia, to travel to Somalia to join the fight with al-Shabaab, <u>and</u> to locate and "slaughter" or "kill" Lars Vilks, who at the time was living outside of Somalia in Europe:

> And I want to send this warning to Lars Vilks who was behind the caricatures defaming our prophet. And I say to Lars Vilks that wherever you are, if not today or tomorrow, know that we haven't forgotten about you. We will get a hold of you and with Allah's permission, <u>we will catch you wherever you are and in whatever hole you are hiding</u>, Inshallah, how what waits you, as it will be nothing but this: slaughter!  For that is what you deserve. <u>And to my brothers and sisters, I call you to make Hijra and if you can kill this dog Lars Vilks, then you will receive a great award from Allah.</u> (Yusuf PSR ¶ 16 (emphasis added).)

n.  Joint Objections: Defendants Ahmed and Yusuf also object to the description in ¶ 14 of the PSR, to the summary of the information related to the February 2, 2009 intercept, discussed above, involving the defendant, Mohamed Yusuf, Bille Ilyas Mohamed, a co-conspirator of the defendants who was located in Sweden, and Yassin Yare, also known as "Sheikh Yahye," who was also discussed in detail above.  Specifically, they object to the following portion of ¶ 14: "Yare, whom Ahmed and Yusuf knew from Sweden, was in telephonic contact with fellow Swedish co-conspirator Bille Ilyas Mohamed and sought to recruit him to join Ahmed and Yusuf in Somalia. During a recorded conversation on February 2, 2009, Yare and Mohamed discussed the fact that Yusuf had arrived in Somalia and, about halfway through their conversation, Yusuf joined the telephone call and requested that Mohamed bring various items when he traveled to Somalia.  Mohamed was later intercepted by Swedish authorities, after he traveled and trained with al-Shabaab, and later returned to Sweden, discussing his plans to carry out a suicide attack in Sweden. Mohamed was convicted in 2010 after trial for conspiracy to commit terrorism, but his conviction was overturned by an appellate court. Mohamed was more recently reported to have traveled to Syria to join the designated terrorist organization ISIS."

First, the defendants object to the description of the speaker identified as "Yusuf," as being the voice of Mohamed Yusuf, noting that the deposition witness knew him as "Hudeyfa" and not by his true name.  Second, the defendants object to the description of other statements made by their co-

conspirator, Bille Ilyas Mohamed, regarding his intention to carry out a suicide attack in Sweden in the Kista Gallery mall.  Third, they object to the inclusion of information regarding Bille Ilyas Mohamed's later travel to Syria, where he sought to join ISIS.

The government disagrees with the defendants' objections in each respect. With respect to the defendants' first objection – as to the identity of the callers in the conversation and thus the relevancy of the recordings – the defendants concede that their co-conspirators, Yassin Yare, also known as "Sheikh Yahye," and Bille Ilyas Mohamed, were both intercepted on the recording.   As set forth above, Ahmed and Yusuf were separately intercepted in Sweden, in November 2008, discussing their relationship with co-conspirator Bille Ilyas Mohamed during the time period they were planning their trip to Somalia to join al-Shabaab.  Moreover, on the February 2, 2009 call, and consistent with the 2008 communications, Yusuf is identified by name, and their co-conspirator, Yassin Yare, intimates a close relationship between Bille Ilyas Mohamed and Mohamed Yusuf: "the message I left for you [with Yusuf's wife] is about the man, your friend Yusuf.  He is with me now."  Significantly too, testimony of one of the deposition witnesses also established that Yusuf, Ahmed and Yare were, at the time of the call, co-located in the al-Shabaab training camp known as Beled Gudud, and that Ahmed and Yusuf had only recently arrived, having departed Sweden in December 2008.  It is also notable too that, notwithstanding their objection to the February 2, 2009 intercept, the defendants do not object to the intercepts summarized later in ¶¶ 20, 21, and 22 of the PSR, which provide additional and significant details, corroborating (1) the intimate conspiratorial relationship among Ahmed, Yusuf, and Bille Ilyas Mohamed, and (2) Bille Ilyas Mohamed's prior travel to Somalia following Yusuf and Ahmed (and Mohamed's subsequent return to Sweden) – which was also discussed in the February 2, 2009, recording.  Those paragraphs are set forth below:

¶ 20 - In 2010, Ahmed and Yusuf communicated regularly, via telephone, with co-conspirator Bille Ilyas Mohamed, who returned to Sweden after traveling to Somalia to fight for al-Shabaab.  During those conversations with Yusuf and Ahmed and other al-Shabaab members, Mohamed frequently inquired about events in Somalia and expressed a desire to return and rejoin the al-Shabaab foreign fighters there. On February 26, 2010, Mohamed and Yusuf discussed a dream that Yusuf had recently had about Mohamed, and then Mohamed asked Yusuf, "So what are the men now? Are they commandos?" Yusuf also advised Mohamed that the "ansars and lots of others have died" and that Yusuf was "going into the woods, brother, you know, God willing." During that same conversation, Yusuf handed the phone to Ahmed, who told Mohamed, among other things, that he had been training so much that he had not slept more than five hours in a single stretch for more than three months.

¶ 21 – During a conversation on May 2, 2010, Ahmed and Mohamed discussed a recent battle in which several al-Shabaab fighters were martyred, which they each referred to as getting "married." Mohamed also discussed a conversation between himself and Yusuf in which they discussed their mutual desire to "marry," as well

16

as Mohamed's hope that Yusuf would wait to "marry" until Mohamed returned to Somalia so that they could "marry" together. Given the context, and given the fact that Mohamed was married and living with his wife in Sweden, Mohamed appeared to have expressed his and Yusuf's mutual desire to die as martyrs in jihad.

¶ 22 - During another conversation in May 2010, Ahmed was intercepted in communication with Mohamed in which Ahmed ascribed responsibility for the Hotel Shamo bombing, a suicide bombing attack by an al-Shabaab foreign fighter in which two Somali ministers and twenty five people were killed while attending a commencement ceremony for medical students in Mogadishu. Ahmed identified the attacker *as a close associate from Denmark*.[7]

Moreover, the Swedish government representative referred to above also identified the voice of the individual identified as "Yusuf" in the February 2, 2009 intercept as that of the defendant, Mohamed Yusuf. Likewise, a United States government linguist and native Somali speaker who is familiar with Yusuf's voice has also identified the voice of the individual referred to as Yusuf as that of the defendant, Mohamed Yusuf.

With respect to the defendants' second objection, to the inclusion of the other statements made by their co-conspirator, Bille Ilyas Mohamed, regarding his intention to carry out a suicide attack in Sweden in the Kista Gallery mall, such statements are relevant and appropriately included in the PSR given Bille Ilyas Mohamed's status as a co-conspirator to the defendants in this case.

With respect to the defendants' third objection to the inclusion of information regarding Bille Ilyas Mohamed's later travel to Syria, where he sought to join ISIS, such a statement is relevant and appropriately included in the PSR in light of Bille Ilyas Mohamed's status as a co-conspirator to the defendants in this case.

o. Joint Objections: The Defendants Ahmed and Yusuf also object to aspects of the language set forth in ¶ 16 of the PSR: "At this time, al-Shabaab's foreign fighters, or muhajareen, were a distinct fighting unit from the indigenous Somali members sometimes called Ansari, or "supporters." The foreign fighters had a separate chain of command, separate training facilities, separate sources of supply, and even distinct uniforms. Further, al-Shabaab's military leadership tended to use muhajireen for different types of missions from the Ansari, given that the foreign fighters training left them better suited to certain types of urban combat and other special operations. By the middle of 2009, with the influx of approximately 20 new foreign fighters from Minnesota, there were approximately 60 to 70 al-shabaab foreign fighters, including Ahmed and Yusuf, operating in and around Mogadishu." Specifically, the defendants object to "the accuracy of the [second] sentence [of this paragraph],

---

[7] Transcripts related to these intercepts are attached hereto as Exhibit C. A small edit to PSR ¶ 22 is reflected in italics in this paragraph.

and the suggestion of . . . that [the defendants] were part of some sort of elite group of fighters."  (Joint Sent. Mem. p. 9.)

The government agrees that the language in ¶ 16 of the PSR should be modified, as follows, to address the defendants' concerns: "*At this time, al-Shabaab's foreign fighters, or muhajareen, were a distinct fighting unit from the indigenous Somali members sometimes called Ansari, or "supporters."  The foreign fighters had a separate chain of command, separate training facilities, separate sources of supply, and even distinct uniforms.  <u>This distinction was driven, in part, due to linguistic barriers between the muhajareen and the Ansari – that is, the foreign fighters often were often unable to communicate in Somali, and the Ansari were often unable to communicate in English. Additionally, certain foreign fighters received better training than their Ansari or local counterparts, and al-Shabaab's military leadership tended to use muhajireen for martyrdom missions, in particular, given that Somali returnees were more often oriented towards martyrdom operations, given that they were more easily isolated and disoriented in the harsh environment of Somalia, separated from their families who were often located thousands of miles away.  Conversely, Ansari often maintained their familial relationships in Somalia – given the social context of their lives and the typical proximity of immediate family and friends.  Often, as a practical consideration, al-Shabaab was not as willing to rely on Ansari for suicide operations, given that the proximity of immediate family and friends meant that secrecy in operational planning was also more difficult to achieve. Continuous monitoring of martyrdom operations has revealed that a disproportionate number of Somali returnees were involved in martyrdom operations carried out by al-Shabaab.</u>  By the middle of 2009, with the influx of approximately 20 new foreign fighters from Minnesota, there were approximately 60 to 70 al-shabaab foreign fighters, including Ahmed and Yusuf, operating in and around Mogadishu.*"

    p.  Joint Objections: The Defendants Ahmed and Yusuf also object to aspects of the language set forth in ¶ 17 of the PSR: "Al-Shabaab fighters decapitated TFG soldiers, leaving the soldiers bodies on the battlefields with their severed heads resting on their chests.  A Minneapolis foreign fighter with whom Ahmed and Yusuf trained, with whom Yusuf was extremely close, Salam Hussein Ali, also known as "Uhud" or "Uhudin" was involved in such an attack in Karan in 2009, in which he and a group of foreign fighters gruesomely decapitated a captured TFG soldier."  The defendants argue that similar to their earlier objection, this description in the PSR is "irrelevant and inflammatory."  (Joint Sent. Mem. p. 10.)

For the reasons set forth in detail above, the government disagrees with the defendants' objection.

    q.  Joint Objections: The Defendants Ahmed and Yusuf also object to the language in ¶ 18 of the PSR: "During the battles, both Ahmed and Yusuf regularly discharged AK-47s." Specifically, the defendants argue the information set forth in this paragraph is incorrect, because the deposition

witness referred to above "testified that he only saw Mr. Yusuf fighting on one day" and that he only saw "Ahmed discharge an AK-47 one time." (Joint Sent. Mem. p. 10.)

The government disagrees with the defendants' objection.  Given the significance and ferocity of the fighting that took place in the Karan District, and throughout Somalia during the time period that the defendants were members of al-Shabaab, it strains credulity to suggest that the defendants only discharged firearms on one occasion during those battles and during the approximate four-year time period they trained with and fought for al-Shabaab.  As one of the deposition witnesses explained, during training in Beled Gudud, Ahmed and Yusuf "would carry around [their AK-47s] 24 hours a[day,] 24 hours without getting rid of it, because it was a rule," and  "w[ould] carry around and use [the same weapon on] the battlefield." (Tr. 110.)  While the witness testified that he only specifically saw Ahmed and Yusuf fire their guns in battle on one occasion, the clear implication of his testimony was that al-Shabaab fighters, like himself and the defendants, regularly discharged firearms or other weapons during their training and fighting: "[w]hat I know for sure is that he fought and fired just like I did.  I wouldn't say specifically that he beheaded somebody but he did fire and he had a weapon. What I know is that he's a muhajareen…." (See Tr. 133-138 (emphasis added).)   Likewise, a second deposition witness testified about how he met Ahmed "frequently [] on the frontlines" in "Northern Mogadishu," when they were "preparing for a raid, an offensive attack on [the United Nation's backed force known as AMISOM]." (Tr. 80-83.)  During the specific engagement, the second deposition witness testified that Ahmed "came and borrowed an RPG" from him for use in "attack[ing] the enemy" whom he characterized as "[t]he Ugandans and CIA-trained mercenaries."  (Tr. 84-85.)   When asked whether he actually saw Ahmed fire the RPG, he indicated that he had not, but after he provided him the RPG, Ahmed "used it and he brought [back] for [him] the launcher."  (Tr. 86.)

> r.   Joint Objections: Defendants Ahmed and Yusuf object to the language contained in ¶ 19 of the PSR which indicates that:  "Despite Yusuf' injury, Yusuf and Ahmed both continued to fight alongside of al-Shabaab's foreign fighters."  The defendants specifically argue that this "assertion" is "unsupported" as "neither of the witnesses who testified in foreign depositions reported observing" Ahmed or Yusuf "engaged in any fighting after the Karan District battles in the summer of 2009" after Yusuf was injured.  (Joint Sent. Mem. p. 10.)

The government disagrees with the defendants' objections.  As an initial matter, neither deposition witness specifically observed Ahmed and Yusuf actually fighting after their involvement in the Karan District battles in 2009, after Yusuf was injured and evacuated to an al-Shabaab hospital for recovery.  Nonetheless, the first deposition witness specifically testified that – shortly before he traveled with the external operations group to Kenya, en route to Kampala to carry out the July 2010 suicide bombing attacks – he saw Yusuf at a Sokohola mosque in Mogadishu, associating with other foreign fighters, including the U.S. foreign fighter Salam Hussein Ali, also known as "Uhud" or "Uhudin." (Tr. 194-

196.)  Likewise, and more significantly, as set forth above, the defendants were later intercepted discussing, with Swedish-based co-conspirator Bille Ilyas Mohamed, (1) the fact that many of their "ansar" colleagues had died in recent and continued fighting, (see PSR ¶ 20), (2) their continued  involvement in military training during the December 2009 – February 2010 time period, (see PSR ¶ 20), (3) their involvement in a battle some time shortly before May 2010, in which several al-Shabaab fighters were killed, (see PSR ¶ 21), (4) their articulated interest in simultaneous martyrdom, (see PSR ¶ 21), as well as (5) their close association with a Northern European foreign fighter who carried out the 2009 suicide bombing attack at the Hotel Shamo that killed two Somali ministers and twenty five people attending a commencement ceremony for medical students in Mogadishu, (see PSR ¶ 22).[8]

      s.  Joint Objections: All of the defendants object to information set forth in the PSR at page 2, and ¶ ¶ 25-26, which they suggest was derived from statements made by the defendants to law enforcement after they were arrested in Djibouti and which the government did not seek to offer in evidence at trial in this case.  First, the defendants object to information in the PSR that details certain aliases, listed on page 2 of each PSR: (1) Yusuf objects to the use of "Mohammed Abdulkadir," and (2) Hashi objects to the use of "Talha." Second, the defendants object to information in the PSR ¶ 25 regarding the fact that the defendants "attempted to travel together to Yemen by way of Djibouti" and other facts set forth in the paragraph regarding their plans to travel to Yemen, and in PSR ¶ 26 information related to their plan to "join al-Qaeda in the Arabian Peninsula" there. (Joint Sent. Mem. p. 11.)

      As to the first objection, the government agrees that Yusuf's alias, "Mohammed Abdulkadir," should be removed, but that Hashi's alias, "Talha," should be remain in the PSR as that alias was provided by a source other than the defendants' statements made in Djibouti.  As to the second objection, the government disagrees and believes that information regarding the defendants' intention to travel to Yemen is appropriately included in the PSR.  As an initial matter, with respect to the defendants' plan to travel to Yemen by boat, no contradictory narrative has been offered to explain their presence in Djibouti.  Presumably, the defendants had no intention of remaining there as they have all indicated they were "arrested with [each other] in a house while in transit through Djibouti." (See e.g. Hashi PSR ¶ 26 (emphasis added).)  Moreover, Madhi Hashi, in a sworn statement before the Special Immigration Appeals Court in the United Kingdom, affirmed specifically that "[t]he intention [of Hashi and his colleagues] was to travel to Yemen" from Djibouti "and then to Saudi Arabia." (SIAC Aff. at 18.)  While the SIAC ultimately dismissed the reliability of Hashi's statements in his sworn affidavit, presumably Hashi and his co-defendants have not – at least as they relate to this aspect of Hashi's plans with Ahmed and Yusuf.

---

[8] Transcripts related to these intercepts are attached hereto as Exhibit C.

To the extent that the defendants now claim that they had given up jihad, or otherwise that they intended to travel from Somalia, to Djibouti, by boat to Yemen, overland to Saudi Arabia, or Sanaa, or by a second boat to Aden, in order to fly on a plane to Europe – such a path of travel is categorically incomprehensible – given the existence of numerous direct flights to Europe from Djibouti City, Djibouti, the instability of the Yemeni government and in light of the significant presence of al-Qaeda in the Arabian Peninsula in that country.  Given the above, whatever their version of their traveling intentions may be, there remains a fair inference, given the fact that the defendants have admitted to having agreed to provide material support to a terrorist organization, that – having fallen out with al-Shabaab leadership, aware of the setbacks al-Shabaab was facing in its ongoing battle against the TFG, having previously expressed a desire to die as martyrs for Islam, and having not having achieved their stated goals of martyrdom – the defendants intended to travel to Yemen to join and fight in Yemen with al-Qaeda in the Arabian Peninsula there.

t.   Joint Objections:  The defendants object to the portions of PSRs ¶¶ 26-27 (and Ahmed PSR ¶¶ 32-33, 38-39, Yusuf PSR ¶¶ 32-33, 28-29, Hashi PSR ¶¶ 44-49, 50-5526-27) which tie Imran Hershi, an individual located in the United Kingdom, to the defendants, as a facilitator who wired a sum of money through a Hawala transfer to assist the defendants in their travel through Djibouti.  Notably, at about the same time the defendants received the money from Hershi, a search was executed of Hershi's residence in London, and U.K. authorities seized, among other things, a Toshiba laptop computer that contained Hersi's resume, along with numerous lectures by now-deceased AQAP leader Anwar al-Aulaqi and instructions on how to build an improvised explosive device.  The defendants first argue that the statements, sworn stipulations made with the advice of counsel, were somehow coercively obtained by the government.   Second, the defendants argue that there is no evidence that their clients had any knowledge of or contact with the materials on Imran Hersi's laptop and that as such the information was only included to "inflame and prejudice" the Court.  (Joint Sent. Mem. p. 11.)

The government disagrees with the defendant's objections.  As an initial matter, it appears that the defendants do not contest the truth or accuracy of the relevant affidavits or the existence, on Imran Hershi's laptop, of the "numerous lectures by now-deceased AQAP leader Anwar al-Aulaqi and instructions on how to build an improvised explosive device."  In hindsight, no doubt, the defendants may regret the shortsightedness of trading a small sum of commissary money in exchange for a stipulation to a significant and relevant fact – the defendants' tie to an individual who subscribes to the jihadist theology of the now-deceased AQAP leader Anwar al-Aulaqi and who also possessed instructions, in his London apartment, on how to build an improvised explosive device – however, no evidence has been offered that would in any way suggest that these admissions were somehow coerced.  Moreover, that the defendants had no specific knowledge of the existence of the materials on Hershi's laptop has no impact on the obvious relevance of the fact that these three admitted terrorists were facilitated financially in their travels by Imran Hershi – an individual who subscribes to the jihadist theology of the now-deceased AQAP leader Anwar

al-Aulaqi and who also possessed instructions, in his London apartment, on how to build an improvised explosive device.

u. Joint Objections:  The defendants object to various related portions of their respective PSRS related to an interview of Hashi conducted in the United Kingdom, in which Hashi advised the U.K. authorities that between May 2008 and May 2008, he "lived in Damascus with two other Somali males" who utilized the aliases "Ismail" and "Yusef." (See Ahmed PSR ¶ 41, Yusuf PSR ¶35, and Hashi PSR ¶ 29.) Specifically, the defendants Ahmed and Yusuf claim that they are not the "Ismail" and "Yusef" referred to by Hashi in his statement to the United Kingdom authorities.  Additionally, the defendants argue that Ahmed's alias "Ismail," was obtained through statements made by the defendants after their arrest in Djibouti.  (Joint Sent. Mem. p. 12.)

While the aliases "Ismail" and the name "Yus[u]f" are names appropriately attributed to the defendants Ahmed and Yusuf, and Ahmed's alias "Ismail," is known to the government through a source other than the defendants' statements, the government does not object to the deletion of the language set forth in the parenthetical contained in each respective paragraph, (see Ahmed PSR ¶ 41, Yusuf PSR ¶35, and Hashi PSR ¶ 29), which ties the names used by Hashi to the defendants Ahmed and Yusuf.

v. Joint Objections:  The defendants object to various related portions of their respective PSRs that detail "the conduct of Mohamed Sakr and Bilal al-Berjawi, individuals that Mr. Hashi purportedly met with in London in 2008." (See Hashi PSR ¶¶ 29-33, Ahmed PSR ¶¶ 41-45, Yusuf PSR ¶ ¶ 35-39).  First, the defendants argue that Ahmed and Yusuf never met Sakr or Berjawi, and thus the inclusion of information about these two individuals for all of the defendants is inappropriate.  Second, the defendants argue that "to the extent that Mr. Hashi may have met with them, their conduct cannot be attributed to Ahmed and Yusuf."   Third, the defendants argue that evidence of the association of between Sakr and Mohamed Emwasi, also known as "Jihadi John," is "beyond attenuated and immaterial to our clients, their conduct, and the formulation of an appropriate sentence in this case" and that the only reason to include this level of detail on Sakr and Berjawi, or Mohamed Emwasi, also known as "Jihadi John," and their ties to Hashi, is to "inflame and unfairly prejudice" the Court.  (Joint Sent. Mem. p. 12.)

As an initial matter, it is unclear, given the style of the objections set forth in this paragraph, whether the defendant, Madhi Hashi, joins in the objections as to this language.  The government presumes, at the outset, that he does not and that these objections are to the PSRs related to Ahmed and Yusuf, only.  Regardless, the government disagrees with the defendants' objections as to these paragraphs in the PSRs.  As an initial matter, the defendants do not appear to object to the veracity of the information contained in the PSR, but largely object on grounds of attenuation, immateriality, and prejudice.  Hashi's relationship with Mohamed Sakr, Bilal Berjawi (and Mohamed Emwazi, also known as

"Jihadi John,") while admittedly damning facts, are quite obviously relevant and extremely significant to complete the understanding of this case and provide insight into why the defendants were later arrested in transit through Djibouti.  Like the relationships set forth in detail throughout the PSR, they provide a framework for understanding the scope of the conspiracy, and there is no real distinction in the inclusion of details regarding these particular terrorists in the PSR – as opposed to the numerous others who are also described therein.  The only meaningful difference, with respect to these particular personalities, is the relevant significance of these figures within the global jihadist movement.

Their inclusion is particularly significant, given that, when Sakr and Berjawi were reportedly killed in a U.S. airstrike, members of the al-Shabaab intelligence service, the *Amniyat*, seized Hashi and imprisoned him on the pretext that he was a spy, in part due to his close relationship with the American-born al-Shabaab leader, Omar Hammami, also known as "Abu Mansur al Amriki," a significant foreign fighter within al-Shabaab, who at the time had run afoul of the al-Shabaab leadership.  During Hashi's incarceration, certain foreign fighters began to become more vocal in their criticism of the way Godane and the *Amniyat* had treated Hammami, and his supporters, including Hashi.  When Hashi was released from custody, he sought out a sympathetic ear with other like-minded members of al-Shabaab and was given advice that the situation in Somalia was bleak, and Hashi was encouraged to look elsewhere for jihad.  (See e.g. Hashi PSR ¶ 24.)  Thereafter, Hashi, Ahmed and Yusuf traveled to Djibouti en route to Yemen.  But for the deaths of Berjawi and Sakr, and Hashi's significant relationship with them, it is likely that Ahmed, Yusuf and Hashi, would not have left Somalia, and they might never have been arrested in Djibouti and charged in the United States.

w.  Joint Objections:  The defendants also object to a Guidelines enhancement set forth in ¶ 60, pursuant to Guidelines 2M5.3(b)(1)(E), which provides for a 2-point enhancement because "[t]he offense involved the provision of material support and resources . . . with intent knowledge, and reason to believe [that the material support] would be used to commit or assist in the commission of a violent act (murder)."  Specifically, the defendants object to the parenthetical "(murder)" as unnecessarily inflammatory, but they do not dispute the 2-point increase in the offense level for a "violent act."  (Joint Sent. Mem. p. 12.)

The government addresses this objection and the appropriate Guidelines calculation in the sentencing memorandum submitted concurrently with this document.

II.   Responses to Objections in Defendant Yusuf's Sentencing Memorandum[9]

a.  Yusuf's Objections: Yusuf objects to the information set forth in ¶ 14 of his PSR: ". . . Yusuf attended basic training at the Buled Gadud training camp . . .

---

[9] Yusuf's Sentencing Memorandum and Objections to the Presentence Report on Behalf of Defendant Mohamed Yusuf is referenced throughout as "Yusuf Sent. Mem."

and later received advanced 'commando' training at another camp." Yusuf argues that this statement is not accurate and misleadingly suggests he was specially selected for advanced training. Yusuf indicates that he received all training at one camp and everyone who was in his group when he started received the same training at the same camp. (Yusuf Sent. Mem. p. 19.)

The government believes that second sentence in ¶ 14 of the PSR should be modified to accommodate Yusuf's objections, as follows: "*Ahmed and Yusuf later received advance "commando" training in <u>a separate part of the Buled Gadud training camp.</u>*"

     b. Yusuf's Objections: Questioning the reliability of a deposition witness, Yusuf also objects to language in ¶ 14 of the PSR which describes the relationship between Salman Hussein Ali, also known as "Uhud," and "Uhudin," and Yusuf as "extremely close." (Yusuf Sent. Mem. p. 19.)

The government disagrees with Yusuf's objection given the Court findings with respect to the witness's reliability and the testimony of that witness discussed above.

     c. Yusuf's Objections: Yusuf also objects to ¶ 19 of the PSR, to the extent that it indicates that Yusuf was fighting in the "Shangani District outside of Mogadishu." (Yusuf Sent. Mem. p. 19.)

The government believes that ¶ 19 of the PSR should be modified to accommodate Yusuf's objections by removal of Yusuf's name from the second sentence of that paragraph.

     d. Yusuf's Objections: Questioning the reliability of a deposition witness, Yusuf again objects to ¶ 15 and 18 of the PSR, to the extent that it characterizes Yusuf's leadership role as a foreign fighter.

The government disagrees with Yusuf's objection given the Court findings with respect to the witness's reliability and the testimony of that witness discussed above.

     e. Yusuf's Objections: Yusuf also addresses details regarding certain "Offender Characteristics" set out in ¶¶ 82, 83, and 89 of the PSR.

The government takes no position with respect to the details objected to by Yusuf related to the "Offender Characteristics" set out in ¶¶ 82, 83, and 89 of the PSR.

     f. Yusuf's Objections: Yusuf also addresses ¶ 111 of the PSR related to the "Factors That May Warrant Departure" set forth in that paragraph.

The government addresses ¶ 111 in the sentencing memorandum submitted concurrently with this document.

III.   Response to Objections in Defendant Ahmed's Sentencing Memorandum[10]

a.   Ahmed's Objections:  Questioning the reliability of a deposition witness, Ahmed objects to certain information in ¶ 18, which describes "Ahmed's enthusiastic approach to the potential of death as a martyr on behalf of al-Shabaab."  (Ahmed Sent. Mem. p. 4.)

The government disagrees with Yusuf's objection given the Court findings with respect to the witness's reliability and the testimony of that witness cited by the defendant.

b.   Ahmed's Objections:  Ahmed renews his objection to PSR ¶ 30, and requests that the paragraph track the "in or about and between" language of the indictment  (Ahmed Sent. Mem. p. 4.)

The government agrees that the paragraph should be amended to reflect that change.

c.   Ahmed's Objections:  Ahmed objects to the spelling of "Johro" in PSR ¶ 77, (Ahmed Sent. Mem. p. 5.)

The government takes not position as to this objection.

d.   Ahmed's Objections:  Ahmed objects to various issues in PSR ¶¶ 80, and 83, related to the history of Ethiopian intervention in Somalia.  (Ahmed Sent. Mem. p. 5.)

The government addresses these objections above, in response to the joint objections of the defendants.

e.   Ahmed's Objections:  Ahmed objects to various issues in PSR ¶¶ 82, 88, 94, and 97, regarding his familial relationships, linguistic capability, and reading privileges in the jail.  (Ahmed Sent. Mem. p. 5.)

The government takes no position as to these objections.

f.   Ahmed's Objections:  Ahmed objects to various issues in PSR ¶ 84, regarding the characterization of his loss of phone privileges.  (Ahmed Sent. Mem. p. 5.)

---

[10] Defendant Ahmed's Memorandum in Aid of Sentencing on Behalf of Defendant Ali Yasin Ahmed is referred to herein in as "Ahmed Sent. Mem."

The government disagrees with Ahmed's characterization of his loss of phone privileges, in particular in light of the information set forth below.

IV.   Government Amendments to the Presentence Investigation Report

a.   The government advises Probation that, contrary to Hashi PSR ¶ 69, Yusuf PSR ¶ 67, and Ahmed ¶ 67, and given the circumstances under which the defendants' pled guilty, the government does not intend to "make a motion stating that it was notified in a timely manner of the defendant's intention to enter a plea of guilty."

b.   The government requests that the following information be added to the respective PSRs for all of the defendants.

"*While incarcerated in the Bureau of Prisons, the following incidents occurred – many of which were specific violations of the SAMs:*

- *In July 2013, on a recorded telephone call at the BOP, Hashi and his father discussed al-Shabaab and Hashi inquired about various al-Shabaab members;*

- *In July 2013, on a recorded telephone call at the BOP, Ahmed and his brother discussed a member of Ras Kamboni[11] and the fact that Ahmed had recently been in Somalia;*

- *In August 2013, on a recorded telephone call at the BOP, Yusuf confided to his mother that the Swedish government had given the U.S. authorities the phone call recordings of discussions between him and Ahmed – apparently referring to the Swedish intercepted communications discussed above in the PSR.*

- *In February 2014, during a recorded telephone call at the BOP, Ahmed's mother placed a call on speaker and allowed several unidentified family members to communicate with Ahmed;*

- *In March 2014, during a recorded telephone call at the BOP, Ahmed provided his brother with the name and a Somali telephone number for Ahmed's wife and instructed his brother to make contact with her;*

---

[11] The Ras Kamboni Brigade is an Islamic jihadist group with ties to al-Shabaab.

- *In April 2014, while conducting a routine search of Ahmed's cell, a BOP officer discovered a note that appeared to contain a written code hidden behind some books;*

- *In June 2014, during a recorded telephone call at the BOP, Ahmed's brother connected him with an unknown third party via speakerphone;*

- *While Hashi was incarcerated, his younger brother Khadar traveled from the United Kingdom to fight for possibly the Islamic State and was killed in Syria or Iraq; in November and December 2014, during a recorded telephone call at the BOP, Hashi discussed these events openly;*

- *At some point prior to April 2015, BOP employees reported finding a "drop note" left by Hashi in the recreation room at MCC New York and, although the note was not addressed to any specific individual, it is believed that Hashi left the note with the hopes that one of his co-defendants would find it as the note appeared to contain a coded message for the reader to decipher, as well as the telephone numbers of Hashi's wife who resides in Somalia and his mother who resides in the United Kingdom;*

- *In April 2015, during a recorded telephone call at the BOP, Hashi sought to encourage his other younger brother to pursue a more fundamental approach to Islam, citing the fact that many other muslims have been "sacrificing their lives for the sake of Allah"; and*

- *In September 2015, during a recorded telephone call at the BOP, Hashi sought information from his father about the location of former senior Al-Shabaab leader Hassan Dahir Aweys."*

c.  The government requests that the PSRs be amended to supplement information contained in the PSRs (see e.g. Hashi PSR ¶ ¶ 35-41) regarding defendant Hashi's collateral litigation before the U.K. Special Immigration Appeals Court ("SIAC") as detailed below:

- *In his sworn affidavit to the SIAC, Hashi had claimed that in early July 2012, his mother had spoken to him on the phone while he was in Somalia and "explained that [she had received a letter in the U.K. indicating that his] citizenship [was] being revoked . . . ." and a "phone call claiming that I was involved in extremist activity." (Hashi Aff. at ¶ 81.) Hashi also claimed that his "mother said that she would appeal" the revocation of*

citizenship and that Hashi "agreed" with this course of action. (<u>Id</u>.)  Hashi also claimed that on July 15, 2012, he had later spoken to his father whom Hashi indicated had discussed with his mother the issue of Hashi's deprivation of citizenship and the fact "that they were taking the matter to court." (<u>Id</u>. at ¶ 86.)  Hashi stated that "[w]hen [Hashi] asked [his father] about the letter [regarding deprivation of citizenship, his father] mentioned something about a 28 day period but told [Hashi] not to worry and that everything would be ok and that he would not allow the deprivation to happen."  (<u>Id</u>.)  Finally, Hashi also claimed that he "was [at the time] <u>very upset about the whole matter</u>" regarding his loss of citizenship and the allegations he was involved in extremist activity. ((<u>Id</u>.) (emphasis added))

- Notably though, the SIAC found that while Hashi claimed in his affidavit to be "highly concerned by the deprivation [of his U.K. citizenship] and insistent on appeal . . .," in reality, Hashi "probably knew quickly of the decision [regarding the deprivation of his citizenship] but [that he] was not concerned to lodge a timely appeal." (SIAC Order at ¶ 120). Similarly, the SIAC Order indicated that Hashi's father was "cross-examined" regarding the "two [differing] accounts" that he had provided to that Court regarding notice of Hashi's deprivation of citizenship.  (<u>Id</u>. at ¶ 106.)  The Court specifically found that Hashi's father "was [un]able to give [a] credible explanation for the inconsistency" and specifically determined that it was "unable to rely on [Hashi's father's] credibility as a witness as a consequence."  (<u>Id</u>.; <u>see also</u> <u>Id</u>. at ¶ 120 ("We have already expressed our concern as to the credibility of [Hashi]'s father and as to <u>conflicts within [Hashi]'s case</u>.") (emphasis added).)

- *The SIAC also found that its "conclusion [that Hashi had falsely claimed concern over his loss of citizenship in the affidavit was also] firmly supported by the CLOSED evidence" submitted in the case.  (SIAC Order at ¶ 121; <u>see</u> <u>also</u> <u>Id</u>. ¶ 122 ("There are strong indications that, contrary to [Hashi's] case, he <u>did not have a high level of concern</u> about the matter. That latter point is strongly supported by the CLOSED evidence, as we point out in the CLOSED judgment.")(emphasis added))*

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:      /s/                          
Shreve Ariail
Seth D. DuCharme
Richard M. Tucker
Assistant U.S. Attorneys

cc: Clerk of Court (JG) (By ECF and Hand)
    All defense counsel of record (By ECF and Hand)