

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

F.#2012R01574

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 8, 2016

<u>By Hand and ECF</u>

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Ahmed, et al.
                  <u>Criminal Docket No. 12-661 (S-2) (JG)</u>

Dear Judge Gleeson:

        The government respectfully submits this letter in connection with the defendants' sentencing, which for Ahmed and Yusuf is scheduled for January 15, 2016, and for Hashi is scheduled for January 29, 2016, and in response to the Court's direction that the parties address Section 6B1.2 of the United States Sentencing Guidelines. For the reasons set forth below, and in the government's accompanying response to the defendants' various objections to the Presentence Investigation Report ("PSR"), the government respectfully requests that the Court accept the defendants guilty pleas and sentence the defendants each to a term of imprisonment of 15 years.

**I.**    **<u>Background</u>**

        On May 15, 2015, the defendants each pleaded guilty before Your Honor to Count One of the operative superseding indictment, which charged the defendants with conspiring to provide material support to the foreign terrorist organization al-Shabaab in violation of Title 18, United State Code, Section 2339B. (Hashi, Ahmed and Yusuf PSRs ¶ 1). The defendants' offense conduct arose from their travel from Sweden, with respect to defendants Ahmed and Yusuf, and the United Kingdom, with respect to defendant Hashi, to Somalia to join al-Shabaab.

        Al-Shabaab is a Somali-based terrorist organization with a long history of engaging in egregious violence. On February 26, 2008, the United States Department of State designated al-Shabaab as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act, as amended, and as a Specially Designated Global

Terrorist ("SDGT") under Section 1(b) of Executive Order 13224, as amended. "Shabaab" is an Arabic word that means "Youth" and is in common use in the Somali language. To date, al-Shabaab remains a designated FTO.

Al-Shabaab has made numerous public statements demonstrating an intent to harm the United States and its allies. For example, in or about April 2009, al-Shabaab declared that it was responsible for mortar attacks against a U.S. Congressman who had been visiting Somalia. Similarly, after an al-Shabaab member was killed by what al-Shabaab believed to be a U.S. missile strike in or about May 2008, al-Shabaab leaders declared that the mujahideen would "hunt the U.S. government" and that governments supporting the United States and Ethiopia should keep their citizens out of Somalia. In addition, on or about April 5, 2008, al-Shabaab declared:

> To the other mujahideen included in the American terrorist list: O Mujahideen brothers! . . . May you be successful in your jihad and may you frustrate the enemies. May Allah help you . . . . Please know, our beloved ones, that we are going through a crucial stage, in which the oppressors have crossed the line. That is why we call upon you to round up and join forces under one leadership and a uniform flag in order to frustrate the enemies of Allah and execute his command . . . . As a result, our jihad will be stronger and more harmful to our enemies.
>
> In conclusion, we say to the patron and protector of the cross, America: the wager that you made on the Ethiopians, Ugandans, and Burundians in Somalia was a failure, and history has proven it. Allah willing, we will attack them, roam [through their ranks], cut off every path they will take, chase away those who follow them, and fight them as insects and wolves. [We] will give them a taste of the heat of flame, and throw them into hell.

On or about February 9, 2012, al-Shabaab effectively joined forces with al-Qaeda when al-Shabaab's leader informed al-Qaeda that his followers "will march with you as loyal soldiers." Representatives of al-Shabaab and al-Qaeda released a video purporting to announce the alliance. Since then, al-Shabaab has continued to inflict numerous, unlawful acts of violence upon innocent civilians in Somalia and elsewhere.

The defendants in this case each abandoned their respective homes in stable European countries to travel to Somalia to join a terrorist organization. Before they left Sweden in late 2008, defendants Ahmed and Yusuf discussed their support for violent jihad and al-Shabaab. (See Ahmed PSR ¶ 11). As set forth in the PSR, Ahmed and Yusuf both discussed al-Shabaab's suicide bombing attacks in October 2008 in Hargeisa and Bosaso, in which al-Shabaab dispatched six suicide bombers – including U.S. foreign fighter, Shirwa

2

Ahmed – to carry out attacks on, among other institutions, the United Nations facility located in Hargeisa. Approximately thirty people were killed, many of them civilians. Yusuf expressed concerns about al-Shabaab's tactics to Ahmed, who sought to characterize the attack as a forgivable "mistake" or "sin," comparable to another forgivable "sin" committed by Yusuf. Unconcerned, both Ahmed and Yusuf arrived in Somalia in December 2008, and underwent physical, military, and doctrinal training at an al-Shabaab military training camp outside of Kismayo, known as Beled Gudud. There Ahmed and Yusuf both received basic and advance military "commando" training under the overall leadership of Saleh Ali Saleh Nabhan, a key member of al-Qaeda in East Africa, and then the Emir of the foreign fighters in al-Shabaab. Having been schooled in military craft by the trainers there, and in al-Shabaab's perverted and global jihadist theology by fellow Swede, Yassin Yare, also known as "Sheikh Yahye," Ahmed and Yusuf then traveled to Mogadishu, where they fought in the brutal Karan District battles, alongside many U.S. and European foreign fighters who had joined al-Shabaab at that time.

The Karan District battles were part of a wider battle for control of Mogadishu waged between roughly May and September 2009. Al-Shabaab captured much of the north of the city, including Karan, in a bid to overthrow the Somali Transitional Federal Government led by the recently elected Islamist president, Sheikh Sharriff. The U.N.-sanctioned AMISOM and TFG forces mounted a counter-offensive and fighting between AMISOM and TFG forces on one side, and Al-Shabaab on the other, shifted back and forth across Karan without a decisive victory by either side.

While the Karan District battles continued, al-Shabaab received critical support from Osama Bin Laden in the form of a message devoted to al-Shabaab that was published in March of 2009 and played for the front-line troops as inspiration in battle. Entitled "Fight on, Champions of Somalia," Bin Laden addressed his "patient, persevering Muslim brothers in mujahid Somalia," specifically endorsed al-Shabaab and denounced the newly-elected president of Somalia, Sheihk Sharif, as an "apostate" who had abandoned his religion in an unholy alliance with the United States.

Yusuf was injured during the battles by a mortar blast, and was sent to an al-Shabaab hospital for recovery. Thereafter, Ahmed and Yusuf continued to train and fight with al-Shabaab. In a separate battle in Mogadishu, Ahmed was observed frequently on the frontlines; on at least one occasion, he was observed after having fired an RPG. Many of Ahmed and Yusuf's "Ansari" colleagues died in the continued fighting, and during the December 2009 and February 2010 time period, Ahmed and Yusuf received continued military training. Likewise, shortly before May 2010, Ahmed and Yusuf were involved in another battle, in which several al-Shabaab members were killed. Relatedly, in a communication intercepted in May 2010, Ahmed and the Sweden-based al-Shabaab member, Bille Ilyas Mohamed, discussed Ahmed, Yusuf's and Mohamed's interest in dying together as martyrs for jihad. Later, in another conversation, Ahmed and Mohamed discussed Ahmed's close relationship with one of the foreign fighters who carried out the 2009 suicide attack on the Hotel Shamo.

3

Yusuf also personally appeared in an inflammatory al-Shabaab propaganda video, filmed in Mogadishu, urging people to fight on behalf of al-Shabaab and to carry out jihadist attacks outside of Somalia.  (See Yusuf PSR ¶ 9).  In addition, according to the sworn deposition testimony of individuals with direct, first-hand knowledge, Yusuf and Ahmed both served alongside of other members of al-Shabaab in Somalia.  Hashi, who arrived in Somalia in late 2009, associated with the notorious American jihadist, Omar Hamami and was affiliated with another suicide bomber, who ultimately died in an al-Shabaab "martyrdom" attack.  (See Hashi PSR ¶¶ 23, 42).  Hashi also filed sworn statements before the U.K. Special Immigration Appeals Commission  ("SIAC") in connection with his loss of citizenship in that country.  The SIAC discredited his sworn affidavit, and dismissed his appeal of the U.K. government's decision to revoke his citizenship, in light of his involvement in extremist activity related to his involvement in al-Shabaab.  (See ECF # 337 (finding that the evidence presented indicated that Hashi, who had claimed to be upset about losing his U.K. citizenship status, in fact did not have a high level of concern about the matter)).   As set forth in the PSR, many additional claims made by Hashi in his sworn affidavit, were dubious at best and inconsistent with his plea to the offense conduct for which he was convicted in this case.  (See, e.g., Hashi PSR ¶ 37 (claiming that, during the time period of the charged conspiracy, he was traveling with his grandmother in Somalia on holiday)).

On or about August 5, 2012, the defendants were apprehended in East Africa by foreign government authorities after illegally crossing the border of Somalia into the neighbouring country of Djibouti, on their way to Yemen.  The foreign authorities detained the defendants and ultimately turned them over to the United States government for prosecution in the fall of 2012.  The defendants have alleged, and the government does not contest, that the defendants were subjected to rough treatment in foreign custody for a short period of time before being turned over to U.S. authorities.

A grand jury in the Eastern District of New York returned indictments against all three defendants, charging them each with multiple federal crimes of terrorism.  Following the production of discovery, overseas depositions, a lengthy *Daubert* hearing and substantial pretrial litigation, the defendants each pleaded guilty shortly before trial in May 2015, pursuant to plea agreements with the government that were conditioned on, inter alia, global disposition of the case and removal from the United States following the conclusion of their respective sentences.

In connection with sentencing, the defendants filed submissions that include numerous objections to the PSR, which are addressed separately in detail.  While the materiality of the defense objections varies widely, there is little room for dispute that the defendants each agreed to offer themselves in support of al-Shabaab, that they made their way to Somalia to join its ranks, that they worked hand-in-hand with other al-Shabaab members and that they were captured shortly after leaving Somalia in the summer of 2012.  Additional facts relevant to sentencing are set forth in greater detail below with respect to each defendant – and in the government's response to the defendants' factual objections that was filed concurrently with this memorandum.

4

## II. Applicable Law

### A. Acceptance of the Guilty Plea

Rule 11(c)(3)(A) of the Federal Rules of Criminal Procedure directs that where a defendant "pleads guilty . . . to . . . a charged offense" pursuant to a plea agreement specifying that "an attorney for the government . . . will move to dismiss other charges," then "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Section 6B1.1(c) of the United States Sentencing Guidelines repeats the language of Rule 11(c)(3)(A).

Section 6B1.2 sets forth the standards for acceptance of plea agreements under the Guidelines. As pertinent here, Section 6B1.2(a) specifies that "the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing Guidelines." Whether to accept a plea agreement rests within the Court's discretion. See United States v. Severino, 800 F.2d 42, 45 (2d Cir. 1986); United States v. TorresEchavarria, 129 F.3d 692, 696 (2d Cir. 1997); see also Fed. R. Crim. P. 11(c)(3)(A) Advisory Committee Notes ("The plea agreement procedure does not attempt to define criteria for the acceptance or rejection of a plea agreement. Such a decision is left to the discretion of the individual trial judge.").

### B. Imposition of Sentence

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct; [and]

>   (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

    C.    <u>Application of the Terrorism Enhancement</u>

Section 3A1.4 of the Sentencing Guidelines applies where, as here, "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," as defined in 18 U.S.C. ' 2332b(g)(5). U.S.S.G. ' 3A1.4 & comment n. 1. Section 2332b(g)(5), in turn, provides that:

>   [T]he term "Federal crime of terrorism" means an offense that -
>
>   (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>
>   (B) is a violation of [one of certain enumerated statutes].

18 U.S.C. ' 2332b(g)(5). The Second Circuit has held that by requiring that the underlying crime "be calculated to influence or affect . . . or to retaliate against government conduct," the statute does not require "proof of a defendant=s particular motive." United States v. Awan, 607 F.3d 306, 317 (2d. Cir. 2010). "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation." Id. By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . . even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities." Id. (emphasis in original). In this case, the offense of conviction - Count One - charged a violation enumerated in 18 U.S.C. § 2332b(g)(5)(b). In addition, by the express terms of the operative plea agreements, the defendants stipulated to the application of the Terrorism Enhancement.

6

### III.  Guidelines Calculation

As set forth in the PSR, the defendants' effective Guidelines range is the statutory maximum sentence of 15 years' imprisonment.  (Ahmed PSR & 101; Yusuf PSR & 99; Hashi PSR & 105).  The Probation Department calculated the Guidelines range for defendants Ahmed and Yusuf, as follows:

| | |
|---|---:|
| Base Offense Level: (2M5.3(a)) | 26 |
| Plus: Terrorism Enhancement (3A1.4(a)) | +12 |
| Plus: Specific Offense Characteristic (2M5.3(b) | +2 |
| Less: Acceptance of Responsibility (3E1.1(a)) | -2 |
| Less: Timely Plea (3E1.1(b)) | <u>-1</u> |
| Adjusted Offense Level: | <u>37</u> |

Probation's calculation is largely consistent with the estimate set forth in the plea agreement and stipulated to by the defendants, except that the government respectfully submits that the plea was not so timely as to warrant a one-level reduction pursuant to Section 3E1.1.  Indeed, the pleas were entered very shortly before jury selection and following substantial pretrial litigation.  Accordingly, the appropriate calculation for defendants Ahmed and Yusuf should be 38.

With respect to defendant Hashi, Probation applied a two-level enhancement for obstruction of justice, pursuant to Section 3C1.1, based on Hashi's materially false statements to the United Kingdom Special Immigration Appeals Court.  (Hashi PSR && 37, 65).  While this enhancement was not contemplated in the plea agreement nor stipulated to by defendant Hashi, the government did not have in its possession all relevant materials relating to Hash's false statements at the time of the plea.  Regardless, declining to grant the additional one-level downward adjustment to all three defendants, or applying the two-level enhancement for Hashi's obstruction, are of no practical consequence to their final adjusted Guidelines range.

While the defendants have no known criminal record, pursuant to the application of the Terrorism Enhancement in Section 3A1.4(b), the defendants' criminal history category is VI.  Category VI provides for an applicable advisory Guidelines sentence of 360 months to life imprisonment whether the adjusted offense level is 37, 38 or, in the case of Hashi, 40.  As noted above, because Count One carries a statutory maximum sentence of 15 years, each of the defendant's effective Guidelines sentence is 180 months.

## IV. The Court Should Accept the Pleas Because They Reflect a Reasonable Exercise of Prosecutorial Discretion

As an initial matter, the Court should accept the defendants' pleas of guilty because they adequately reflect the seriousness of the conduct while sparing the government of substantial litigation burdens and commensurate risks. Rule 11(c)(3)(A) of the Federal Rules of Criminal Procedure directs that where a defendant "pleads guilty . . . to . . . a charged offense" pursuant to a plea agreement specifying that "an attorney for the government . . . will move to dismiss other charges," then "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Section 6B1.1(c) of the United States Sentencing Guidelines repeats the language of Rule 11(c)(3)(A).

Section 6B1.2 sets forth the standards for acceptance of plea agreements under the Guidelines. As pertinent here, Section 6B1.2(a) specifies that "the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing Guidelines." Whether to accept a plea agreement rests within the Court's discretion. See United States v. Severino, 800 F.2d 42, 45 (2d Cir. 1986); United States v. Torres Echavarria, 129 F.3d 692, 696 (2d Cir. 1997); see also Fed. R. Crim. P. 11(c)(3)(A) Advisory Committee Notes ("The plea agreement procedure does not attempt to define criteria for the acceptance or rejection of a plea agreement. Such a decision is left to the discretion of the individual trial judge.").

Here, the Court should accept the plea agreements because the negotiated dispositions appropriately balance the seriousness of the defendants' conduct against the significant prosecutorial risks and burdens avoided through a negotiated resolution, and permit careful allocation of prosecutorial and other governmental resources that would otherwise be devoted to pretrial and trial litigation. On one hand, as discussed further below, the defendants' crimes were profoundly serious: they conspired to provide support to a deadly foreign terrorist organization, and in actuality joined that organization and participated in its activities overseas. In so doing, they posed a danger to American lives and interests, and accordingly deserve a very serious sentence.

On the other hand, had the government and the defendants not reached a plea agreement, the government would have been faced with the risk of trial, which in all cases includes the possibility of adverse verdicts on one or more counts of the indictment. Moreover, had the defendants elected to proceed to trial, or to exercise all of their pretrial litigation options, the government would likely have been required to engage in substantial litigation, such as litigating pending motions for protective orders pursuant to the Classified Information Procedures Act, see 18 U.S.C. App. III §§ 4-6.

As the Court is aware, such litigation can be unusually burdensome even in the most straightforward of cases, and can pose exceptional burdens where, as here, complex

8

issues are present. Nor do such burdens fall solely on the Department of Justice and the investigating agencies associated with the Federal Bureau of Investigation's Joint Terrorism Taskforce. Rather, the responsibility to protect against undue disclosure of sensitive national security information requires coordination with other U.S. government agencies and, in some instances, foreign governments.

Plainly, where the government can secure a substantial sentence that adequately reflects the Section 3553(a) factors without causing additional burdens on its international counter-terrorism apparatus, it is in the national security interest of the United States to do so. In the judgment of the government, the mutual concessions in the plea agreements in this case accomplish those twin aims by providing the sentencing court with the opportunity to impose a reasonable sentence in light of the defendants' acceptance of responsibility and any mitigating factors that militate towards a below-Guidelines sentence, and by permitting the government to focus its resources on additional offenders and additional threats. See generally United States Attorney's Manual § 927.420.

Such interests have long been recognized as appropriate bases for the exercise of prosecutorial discretion:

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly illsuited to judicial review. Such- factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern.

Wayte v. United States, 470 U.S. 598, 607 (1985). As this Court has noted, "Although the Supreme Court used that language in addressing the decision whether to prosecute, it is equally applicable . . . to whether an arguably reasonable sentence bargain is appropriate." Hon. John Gleeson, Idea: the Sentencing Commission and Prosecutorial Discretion: the Role of the Courts in Policing Sentence Bargains, 36 Hofstra Law Review 639, 656 n.68 (2008). While this case does not involve sentence bargaining per se, the Supreme Court's reasoning applies where, as here, a plea bargain effectively limits the defendants' sentence to the statutory maximum prison term.

Balanced against the above prosecutorial interests, sentences at the statutory maximum of 15 years will "adequately reflect the seriousness of the actual offense behavior" and "not undermine the statutory purposes of sentencing or the sentencing Guidelines." As set forth below, the plea agreements preserve the Court's authority to impose significant sentences that serve the statutory interests of sentencing. While the operative indictment included additional substantive counts of providing and attempting to provide material support to terrorists, as well as weapons and training counts, in that the defendants joined and

9

trained with a group of foreign fighters in Somalia, the counts were related to a common scheme.

All three defendants pleaded guilty and accepted responsibility before a jury had been empanelled in a global disposition of a complex case. Moreover, the defendants' conduct was wholly extra territorial, not specifically directed at Americans, and their need for just punishment in the U.S. prison system is mitigated to some extent by the treatment they received during a short period of time in foreign custody as well as their agreement to removal from the United States following the service of their respective sentences. Accordingly, under all of the foregoing circumstances, some of which are highly unusual, the Court should accept the plea agreements and proceed to sentencing.

### V. Sentencing Analysis

A careful analysis of the statutory sentencing factors requires a sentence of 15 years' imprisonment, taking into account all of the relevant facts. In a case such as this, where the statutory maximum is substantially below the advisory Guidelines range, the Court must obviously be careful not to afford the maximum sentence an "air of inevitability" and must diligently conduct an analysis under Section 3553(a). United States v. Corsey, 723 F.3d 366, 375 (2d Cir. 2013). Here too, though, the Court should recognize that the government's charge bargain with the defendants has already afforded them what is in effect a downward adjustment by limiting their exposure to 15 years – a reasonable sentence, and one that is sufficient but not greater than necessary to comply with the aims of sentencing. To be clear, the plea agreement extended by the government took into consideration not only the litigation risks and burdens that the government would have to assume had the case proceeded to trial, but also the fact that defendants were incarcerated under harsh conditions in a foreign country. Notably too, there is no allegation – nor evidence to support – that the United States government was aware of, or complicit in, any rough treatment to which the defendants were subjected.

The central question before the Court is whether any additional downward adjustment, below 15 years, is appropriate in this case. For the reasons set forth below, the government respectfully submits that a sentence of less than 15 years would be insufficient to satisfy the 3553 factors with respect to each defendant. First, the nature and circumstances of the offense are very serious. The defendants were operational members of a terrorist organization that has engaged in political assassinations, the kidnapping of civilians and suicide bombings, among other horrendous activities. These facts were well known, and it is readily foreseeable that, by engaging in the conspiracy to which the defendants plead guilty, each of them expected to engage in such serious crimes. Moreover, with respect to defendants Ahmed and Yusuf, there is specific evidence that these defendants engaged in combat operations with al-Shabaab. There is also evidence in the record that Hashi was affiliated with the deadly al-Shabaab suicide bomber program.

As to the history and characteristics of each defendant, it is notable that while each was born in Somalia, they were living in stable communities under relatively normal

10

conditions in Sweden and the United Kingdom. There is nothing in any of their backgrounds that adequately explains or substantially mitigates the offense conduct they embraced. As ethnic Somalis, it is natural that they should feel sympathy for Somalis living under harsh conditions in their country of birth, but that sympathy cannot and does not justify conspiring to provide material support to terrorists. There are innumerable ways to help rebuild a country that do not involve supporting al-Shabaab's horrific agenda of attacks on civilians, beheadings, suicide bombings and assassinations.

It is of course no secret at the time of this sentencing that the siren's call of foreign terrorist organizations like al-Shabaab draws young men from all corners of the globe to wage violent acts against innocent civilians. Indeed, more than one has stood before this Court at sentencing. Here, not only did these defendants answer that call, defendant Yusuf himself was the voice of the call to jihad, in a propaganda video. Ahmed served as a human platform for a shoulder-fired rocket. Hashi consorted with a notorious American al-Shabaab leader, and embraced and endorsed the intentions of a suicide bomber. While the government admittedly is not aware of information to indicate that these defendants posed a <u>specific</u> threat to any Americans, other than those they would recruit to their cause, their collective efforts to strengthen al-Shabaab by agreeing to provide themselves in support of its cause, unquestionably increased the strength and numbers of a group dedicated to the destruction of the United States and its allies in the region and encouraged other Westerners, by way of example, to abandon the rule of law and to take up arms against secular governments and civilians around the world. Such crimes are especially serious, and demand just punishment that will promote respect for the law, provide just punishment for the offense, afford adequate deterrence and protect the public from further crimes.

The defendants' conduct is particularly troubling given their established close associations with other high-ranking and violent al-Shabaab members and conspirators. For example:

- Hashi's relationship with the now-deceased al-Shabaab leader Omar Hammami, the notorious American foreign fighter who served as a de facto leader of a dissident group within al-Shabaab;

- Ahmed and Yusuf's close relationship with the U.S. foreign fighter, Abdi Salam Hussein Ali, also known as "Uhud," or "Uhudin," who a witness observed savagely decapitating a TFG soldier on the battlefield in the Karan District;

- Ahmed and Yusuf's close relationship with a Northern European foreign fighter turned suicide bomber who detonated himself at the Hotel Shamo in 2009, killing at least two Somali ministers and twenty-students attending a rare commencement ceremony in Mogadishu;

- Ahmed and Yusuf's close ties to Yassin Yare, also known as "Sheikh Yahye," who "would preach about" carrying out attacks outside of Somalia, (Dep. Tr.

11

119), and that jihad "had to be spread around the world in other countries," (Id. at 120), while Yusuf translated for other al-Shabaab foreign fighters in the Beled Gadud training camp;

- Hashi, Ahmed and Yusuf's ties to Imran Hershi, an individual who subscribed to the jihadist theology of the now-deceased AQAP leader Anwar al-Aulaqi and who also possessed instructions, in his London apartment, on how to build an improvised explosive device;

- Ahmed and Yusuf's ties to Bille Ilyas Mohamed, a Swedish foreign fighter who traveled to Somalia to join al-Shabaab, returned to Sweden to plot an attack in Stockholm, and pledged to die together as a martyr in jihad with Yusuf and Ahmed;

- Ahmed and Yusuf's ties, beginning in mid-2009, with a large group of foreign fighters who had recently traveled to Somalia from Minnesota, including:

    o Mohamed Abdullahi Hassan, also known as "Ubeyda";
    o Troy Matthew Kastigar, also known as "Mohamed";
    o Mohamed Ali Hassan, also known as "Saifullah";
    o Abdikadi Ali Abdi;
    o Zakaria Sharif Maruf, also known as "Khalil";
    o Abdirashid Ali Omar;
    o Jamal Sheikh Bana, also known as "Ashraf"; and
    o Burhand Ihrahim Hassan, also known as "Harun."

- Ahmed and Yusuf's ties to Ahmed Ali Omar, also known as "Mustafa," another high-ranking foreign fighter from Minnesota;

- Ahmed and Yusuf's ties to Osman Yasin Ahmed, also known as "Atosh," and "Abdurham," Ahmed's older brother who likely coordinated Ahmed and Yusuf's travel to Somalia to join al-Shabaab;

- Ahmed and Yusuf's ties to Shuaib Ali Sheik Mohammed, also known as "Yusuf Dhere," a young Swedish foreign fighter who was killed fighting as a martyr for al-Shabaab;

- Hashi's ties to Mohamed Sakr and Bilal Berjawi, two senior leaders with al-Shabaab's foreign fighters, who were reportedly killed in airstrikes in Somalia; and

- Hashi's tie to Abdul Salam, a member of al-Shabaab's martyrdom operations group.

These relationships have meaning, and ultimately extraordinary significance for purposes of understanding the conspiracy to which these defendants all pled guilty. And, whatever value one might ascribe to a particular relationship here, these relationships are all appropriately considered in fashioning a sentence that takes into account the "nature and circumstances of the offense," the "history and characteristics of the defendant[s]," and the need "to reflect the seriousness of the offense," the need to "provide just punishment," the need to "afford adequate deterrence," and the need to "protect the public from further crimes," among the other factors set forth under 18 U.S.C § 3553(a) .

The defendants make much in their submissions of this idea that their decision to join al-Shabaab was driven by a desire to help Somalia and its war torn people. Ahmed claims that his decision to "join al-Shabaab was rooted in [a] sense of responsibility and a desire to do something to help." (Ahmed Sent. Mem. at 24.). Yusuf claims that he is not a "violent person" or a "fanatic," (Yusuf Sent Mem. at 2.), but that he was simply "motivated by an abiding belief[s] that the people of Somalia have the right to political self-determination," (id. at 3.), and "his efforts were directed exclusively toward his homeland, Somalia" and that it was "[o]ut of a profound concern for the safety, security and future of the Somalian people,"(id. at 5.). Hashi claims that he "wanted to see his country, smell the air and help his people." (Hashi. Sent. Mem at 3.)

Such claims ring hollow at sentencing, when excuses are often made in hopes of leniency. Here such claims stand in direct opposition to the undisputed fact of each defendant's individual decision to join as members of a terrorist organization which sought to destroy the elected government of Somalia, and whose primary objective was to kill non-believers and apostates throughout that country.

Such claims are disingenuous given that Ahmed, Yusuf and Hashi chose to join a fighting group which, by their own accounts: "distinguished itself from other groups [in Somalia at that time] in that it [] 1) used assassination as a tactic, and as early as 2007 and 2008, was assassinating government figures, elders, civil society figures, students, journalists and aid workers (See Bryden Tr. at A45-A46); (2) used improvised explosive devices or IEDS (See Bryden Tr.at A52-A53); (3) had been orchestrating suicide bombings since possibly as early as 2006, and definitely in 2007 and 2008 (See Bryden Tr. at A53-A57); (4) saw its designation as [a terrorist organization] in early 2008 as a badge of honor (See Bryden Tr. at A44); and (5) sought to bring their own form of Islamic government to Muslims everywhere, and believed that violence against governments that weren't sufficiently Islamic was justified." (Joint Sent. Mem. p. 21 (citing Bryden Tr. at A48-A51.)(emphasis added))

They are disingenuous given Yusuf's invitation, in an al-Shabaab recruiting video, to other young Muslim men in the United State, Europe and elsewhere, to embrace the death wish of "jihad in Somalia . . . [to] take part in this blessed jihad which is between good and evil, between light and darkness, and between truth and falsehood." And, they appear

13

disingenuous when Yusuf mimics an execution, and threatens the death of "Lars Vilks who[m he claims] was behind the caricatures defaming [the] prophet":

> And I say to Lars Vilks that wherever you are, if not today or tomorrow, know that we haven't forgotten about you. We will get a hold of you and with Allah's permission, we will catch you wherever you are and in whatever hole you are hiding Inshallah, know what waits you, as it will be nothing but this: slaughter! For that is what you deserve. And to my brothers and sisters, I call you to make Hijra and if you can kill this dog Lars Vilks, then you will receive a great award from Allah.

These claims lack any real credibility given the fascination with death and destruction that was revealed when Ahmed and Yusuf spoke freely on intercepts about the gratuitous death of foreign fighters and *Ansari*, on the battlefield or in suicide bombing attacks in Somalia. And these claims should be ignored - given Hashi, Ahmed and Yusuf's collective ties to those suicide bombers, to al-Qaeda members, to those who relish decapitation, and to other jihadists bent on the destruction of Somalia, the United States, our East African and European allies, and so-called non-believers and apostates around the world.

Any harsh treatment that the defendants received at the hands of foreign authorities is inexcusable. The arrest and prosecution by the United States government of these three defendants, however, is entirely consistent with statutory authority and our government's obligation to disrupt, deter and incapacitate international terrorists in the interest of the national security of the United States, and in the interest of the good and decent people of our global community. Likewise, at sentence in a case where the defendants are all international terrorists who consider martyrdom a public good, death as paradise, and slaughter an imperative, the need to "afford adequate deterrence," and to "protect the public from further crimes," both inside and outside of the United States, could not be higher.

## **Conclusion**

For the reasons set forth above, the government respectfully submits that the Court impose a sentence of 15 years' imprisonment with respect to each defendant.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:    /s/
Shreve Ariail
Seth D. DuCharme
Richard M. Tucker
Assistant U.S. Attorneys
(718) 254-6616/6021/6204